Anderson, J.,
delivered the opinion of the court
The doctrine has been well settled by several decisions of this court, that a fiduciary is not justified in receiving greatly depreciated currency in payment of a gold debt, or a debt which was equivalent to gold, unless it was necessary for the payment of debts or legacies, or unless other circumstances in relation to the safety of the debt or the condition of the estate made it expedient and proper. Hannah's adm'r v. Boyd & wife, 25 Gratt. 692, 701-2; Tosh v. Robertson, 27 Gratt. 270; Bedinger v. Wharton, Ib. 857. It has also been *96 held that a fiduciary had no right to collect a specie debt in Coufederate money when greatly depreciated, for the purpose of investment. Campbell's ex'ors v. Campbell's ex'or, 22 Gratt. 649; Crickard’s ex'or v. Crickard’s legatees, 25 Gratt. 410. That it would be a devastavit and breach of trust in an executor. It is also the settled doctrine of this court that the debtor, or he who pays the money to the executor, in discharge of the obligation, knowing that it was not needed for the payment of debts or legacies, or that the safety of the debt did not require its collection, but that if received it would be for investment, and would involve the executor in a devastavit and breach of trust, will be held to be a participant in the devastavit and breach oj trust. Pinckard v. Woods, 8 Gratt. 140; Cocke & al. v. Minor als., 25 Gratt. 246; Jones' ex'or v. Clarke, Ib. 642; and Tosh v. Robertson, supra.
The court is of opinion that the bond of Thomas M. JBonduraut, deceased, and Grandison Mosely, involved in this suit, was for a gold debt or its equivalent. It was executed to James M. Patteson, prior to the late war, for a tract of land in Buckingham county, known as Oaklawn. The tract of land was sold by the said Patteson to Thomas M. Farrow, in 1857, for $12,000, and the said Farrow executed his bond, with security therefor, on the 23d ©f January, 1858, payable six years after date, with interest from the 1st of January, 1858. The said Farrow, some time in 1860, sold the same tract of land to Thomas M. Bondurant, for a fraction less than $13,000; and by agreement between the parties, Bondurant executed his bond jointly with Grandison Mosely for $12,000, part thereof, to James M. Patteson, which he received in place of Farrow’s bond, which he surrendered to hirm The Bondurant bond was payable at the same time, the 23d of January, 1864. In 1862, James M. Patteson died, and by his will appointed his wife, *97 "Willie Aim Patteson, his executrix, requesting that she ■should not be required to give security. He directed that his estate should be kept together until his child attained twenty-one years of age, for the purpose of raising and educating his children, unless his representatives should think it practicable to advance his children, as they became of age or married, not exceedingin any case their distributive shares of his estate respectively. He also authorized his three sons to qualify as his executors, as they respectively attained twenty-one years of age. It does not appear that either of them ever qualified. He left five children, all of whom were infants at his death.
Thomas M. Eondurant also died the same year, and Thomas and Alexander J., his sons, and William P. Hall, qualified as his executors. In the month of December, 1863, Alexander J. Eondurant, as executor, paid the executrix the amout of said bond of $12,000, in Confederate money, dollar for dollar, and took up the bond. At that time Confederate money was so depreciated that twenty dollars of it was worth only one in gold, and the said executor discharged a gold debt of $12,000 in a currency which was worth only one-twentieth of its value, or $600.
It appears that less than twelve months before, this same executor, when he paid to Mrs. Patteson, the executrix, the interest then due on said bond, proposed to pay hen in a short time the principal in Confederate money, when she informed him that she was unwilling to receive it, and had no use for it. Confederate money was then of much greater value, being in relation to gold as three to one, than it was in December following, when she received it.
How can this be explained ? It is accounted for by= the evidence in the record. Shortly before the Confed *98 erate money was tendered to her by said executor, she had been informed by the Confederate assessor that she was required by the law then m force to receive payment of ante-bellum debts in Confederate money, or pay her taxes in gold or silver, and that unless she would take an oath or pledge her solemn word to receive payment of such debts in such currency, she would have to pay her taxes in gold or silver. She was unable to pay her taxes in gold and silver, and relying upon this representation, as she and her eldest son, George, who was then about seventeen years of age, understood it, she solemnly pledged her word to the assessor that she would receive payment of her ante-bellum debts in that currency. Soon afterwards her said son met the said executor in the road, who asked him if his mother would receive payment of the bond in question in Confederate currency ? To which George replied that, as she would have to receive it in that currency, or pay her taxes in gold or silver, which she was unable to do, he supposed she would receive it. And thereupon he sent a message by him to his mother, that he would be down in a few days to pay the money. This is proved by George Patteson, and there is no testimony in conflict with him, and although Mr. Bondurant says in his answer that he does not recollect of sending the message, the testimony of George is corroborated by the circumstances.
He came down, he says, about the 11th of December. Mrs. Patteson and George both testify that it was the Saturday before the second Monday. Mr. Bondurant states affirmatively that he was there previously in November, but there, is no testimony to support it, and the testimony of both Mrs. Patteson and George is to the contrary. He is probably mistaken, and confounds the interview with George with an interview with his mother in November. It is probable he intended to call on Mrs. Patteson, and after meeting with George he deemed it *99 unnecessary. There is some discrepancy in his statement in his answer of what occurred when he called, to pay the money and lift his testator’s bond, and the testimony of Mrs. Patteson and George; or at least his statement is not as full as theirs. It is doubtless an honest difference in recollection, so far as they differ, and is not material.
It is evident that the executrix, in accepting payment in Confederate money so depreciated, acted under constraint. She did not freely and willingly receive it; but she took it because she felt that there was no help for her, that she was obliged to receive it, or submit to what she regarded as a greater evil. The executor denies that he had any complicity or connection with the statements and representations as laid to the door of "William P. Oliver. If these representations had been made by his contrivance, or at his suggestion, it would have been the perpetration of a gross fraud against the representative of James M. Patteson. There is no proof to sustain any such imputation. lie does not believe that William P. Oliver made any such statements. That he did, is proved by two witnesses. And he adds, if he did, he was ignorant' of it, and is in no manner responsible therefor. He says further, he does not know that he ever mentioned the $12,000 bond to Oliver, the assessor; if he ever did, it was alone in connection with the lists of his testator’s estate. He does not say that it was not mentioned to him by one of his co-executors, nor do they deny having mentioned it to him. He admits that on the rendition of the lists, they indicated a willingness, as executors and as individuals, to receive Confederate States treasury notes for their respective dues. If such a declaration -was required of them by the assessor, they might well conclude that it would be required of Mrs. Patteson. He does not say that he did not know she had pledged her word to the assessor that she would *100 receive Confederate money in the payment of ante-bellum debts. He. must have had some information, or reason, which induced him to enquire of George Patteson if his “mother was ready to receive the money for the $12,000 bond,” when she had refused to receive it months before, when the currency was far less depreciated. At all events he learned from him-the reason why she would receive it, if at all, because the lodgment had been made on her mind by some means or other, that if she refused to receive it, she would have to pay her taxes in gold or silver. He learned the same from Mrs. Patteson when he paid her the Confederate money and demanded his testator’s bond. He knew that she did not receive it of her free will and accord, but under the impression of constraint and compulsion; that she regarded it as almost worthless; that she had no use for it; that she did not need it for the payment of debts or legacies, because her calculation was that she would have to invest it; for she asked his advice how she had best invest it, and he gave it to her.
Hpon this presentation of the case by the record, it appears that for this gold debt of $12,000, due the estate of her testator, his children and distributees being infants, the executrix received from the executor of the obligor, Confederate money worth only about $600 in gold, when it was not necessary for her to collect it for the payment of debts or legacies, or for the safety of the debt, but for investment. The debt seems to have been at that time perfectly secure. The land was bound for it. It was also secured by Grandison Mosely being jointly- bound for it with the estate of Thomas M. Bondurant. There is nothing in the record to show that Mosely was not entirely solvent and good for the debt; and the estate of the principal obligor is shown to have been at that time very valuable, both as to the personalty and the realty; so valuable that his executors, before qualification, were *101 required to execute a bond in the penalty of $400,000. The court is of opinion, therefore, upon the authorities above cited, that the executrix, in receiving payment the said debt in a currency of so little value, committed a devastavit and breach of trust. There is a class of cases in which this court has not held the payer of the money to an executor or administrator, to be a participant in the devastavit or breach of trust, upon the ground that he could not be presumed to know what was the condition of the estate, or that there might -not be uses for which it could be advantageously received and applied for the benefit of the estate, or that there might be a necessity on the executor to receive it for payment of debts or legacies. Tosh v. Robertson, supra. But in this case no such presumption can be raised in favor of the executor of the principal obligor, for it is shown that he was informed that the executrix had no use for'the money, and that if she received it she would have to seek out some mode of investment, and he required her to take it, though he was aware that she was very averse to it, and only yielded her objections under a wrong impression that if she did not, the estate would be subjected to greater evils.
Under these circumstances, as disclosed by this record, Alexander J. Bondurant, executor of Thomas M. Bondurant, the principal obligor, must be held, not only to have participated in the devastavit and breach of trust, but to be responsible for it, and to be primarily liable therefor to the heirs and distributees of James M. Patteson, deceased, and that the estate of the principal obligor and the surety of Grandison Mosely are still liable on said bond, and that there should be a decree in favor of Willie Ann Patteson, executrix of James M. Patteson, against the executors of Thomas M. Bondurant, deceased, de bonis testatoris, for $12,000, the principal of said bond, with interest thereon at the rate of six per *102 centum, per annum, from the 1st of January, 1864, till payment, subject to a credit as of the first of January, 1864, for $1,235.65, the value of the tobacco in which a portion of the Confederaté money received by the executrix was invested, and which she realized, being more than the scaled value as of that date of the whole of the Confederate money paid to her by the said executor; and that the said tract of land known as Oaldawn, for the purchase money of which said bond of $12,000 was given, shall be sold and the proceeds of sale be applied to the payment of the balance due on said debt; and if that shall prove insufficient to satisfy the same, the decree should authorize the executrix to sue out an execution of ji. fa. against the assets of the said Thomas M. Bondurant, deceased, in the hands of his executors to be administered for the residue of said debt; and if that should prove unavailing, that she be allowed to apply to the said circuit court for further assistance to obtain satisfaction, of what may remain of said debt, out of the estate of said Thomas M. Bondurant, deceased, and ultimately against the surety, Grandison Mosely, if the estate of said decedent should prove insufficient to satisfy the whole debt and costs, for what may remain to be satisfied.
The court is of opinion, therefore, to reverse the decree of the circuit court of Buckingham, with costs, and to remand the cause for further proceedings to be had therein in conformity with this opinion.
The decree was as follows:
The court is of opinion, for reasons stated in writing • and filed with the record, that the executrix of James M. Patteson committed a devastavit and breach of trust in receiving Confederate money from Alexander J. Bondurant, executor of Thomas M. Bondurant, in De *103 «ember, 1868, when it was greatly depreciated, in payment of the bond of twelve thousand dollars, executed in 1860 by the said decedent jointly with Mosely as his surety, for the tract of land situate in Buckingham county, known as Oaklawn; and that under the circumstances of the case, the said Alexander J. Bondurant, as executor as aforesaid, must be held not only to be a participant in said devastavit and breach of trust, but should be held primarily liable therefor.
It is, therefore, adjudged and decreed that the decree of the circuit court dismissing the plaintiffs’ bill be reversed and annulled, and that the executors of Thomas M. Bondurant, deceased, out of any assets of said decedent in their hands, do pay to the plaintiffs their costs expended in the prosecution of their appeal here.
And the court, proceeding to render such decree as ought to have been rendered by the court below, it is ■decreed that Thomas L. Bondurant, Alexander J. Bondurant, and 'William P. Hall, executors of Thomas M. Bondurant, deceased, do pay to Willie Ann Patteson, executrix of James M. Patteson, out of any assets of the estate of said Thomas M. Bondurant in their hands to be administered, the sum of twelve thousand dollars, with interest thereon at the rate of six per centum per annum from the 1st day of January, 1864, till payment, subject to a credit for $1,235.65 as of the said 1st day of January, 1864, and the costs of this suit in the said circuit court. And unless the same be paid in a reasonable time, to be determined by said court, that a decree be entered therein for the sale of the tract of land in the bill and proceedings mentioned, known as Oaklawn, upon such terms as the said court may deem reasonable and just, to satisfy the same. And if the proceeds of such sale should be insufficient to satisfy the whole .of said debt with interest and costs, and there is no estate of said decedent out of which the residue thereof can.be *104 satisfied, the said Willie Ann Patteson, executrix as- . . - . aforesaid, may apply to the said circuit court for a decree against Grandison Mosely, the surety of the said Thomas-M. Bondurant in the said bond for $12,000, for the unsatisfied residue thereof. And this cause is remanded to ccrar* °f Buckingham county for further proceedings to be had therein, in conformity with this order' an(| 0pjnj0n £iec| with -fije record.
Decree reversed.